IN THE MATTER OF A FILING BY THE NORTH CAROLINA AUTOMOBILE
RATE ADMINISTRATIVE OFFICE FOR A REVISION OF LIABILITY
RATES ON PRIVATE PASSENGER VEHICLES

No. 39

(Filed 5 April 1971)

1. Insurance § 1; Constitutional Law § 7— power of Commissioner to fix rates

The only power the Commissioner of Insurance has to fix rates is such power as the General Assembly has delegated to and vested in him.

2. Administrative Law § 4; Insurance §§ 1, 79.1— determination of automobile insurance rates — applicable rules of evidence

The statute providing that the rules of evidence as applied in the superior and district courts shall be followed in all administrative proceedings before State agencies, *held* not applicable to a public hearing before the Commissioner of Insurance on proposals for a general revision of insurance rates submitted by a statutory rate-making bureau. G.S. 143-317; 143-318.

3. Insurance § 1— rate-fixing power of the Commissioner

The power of the Commissioner of Insurance to fix rates effective from a specified future date is a legislative power. G.S. 58-248.

4. Insurance § 79.1— automobile insurance rate hearing — competency of evidence for rate hearing

In fixing a 2.8% rate increase on passenger automobile liability insurance effective 28 January 1970, the Commissioner of Insurance could properly consider testimony and documentary evidence that had been compiled by the Automobile Rate Administrative Office from various sources, including (1) data furnished by the Statistical Agents of the Rate Office reflecting the composite experience of all licensed insurance companies and showing that losses for 1966 and 1967 had exceeded the proportion of the premiums allocated for the payment of losses under the then existing rates, and (2) data obtained from various state, federal and private agencies showing the increase in motor vehicle accidents, hospital charges, physicians' fees, automobile repair parts, and weekly gross earnings of production workers; the fact that much of this evidence would have been inadmissible in a trial in the superior or district courts does not affect the Commissioner's consideration of it in the rate hearing. G.S. 58-27.1; G.S. 58-248; G.S. 58-248.1.

5. Insurance § 79.1— automobile insurance rates — showing of "expense loading" component

Data submitted to the Rate Office by automobile liability insurers must reflect the insurers' underwriting profit and loss experience in North Carolina.

**6. Insurance § 79.1— automobile insurance rate increase**

An order of the Insurance Commissioner approving a 2.8% rate increase on passenger automobile liability insurance is supported by sufficient evidence and is affirmed by the Supreme Court, although the data submitted by the Rate Office failed to show the insurers' underwriting profit and loss experience in this State.

Justice LAKE dissenting.

APPEAL by the Attorney General from the judgment entered by *Bailey, J.,* on April 24, 1970, in WAKE Superior Court, certified in accordance with G.S. 7A-31(a) for initial appellate review by the Supreme Court, docketed and argued as No. 9 at Fall Term 1970.

On July 1, 1969, the North Carolina Automobile Rate Administrative Office (Rate Office) made a filing with the Commissioner of Insurance (Commissioner), pursuant to G.S. 58-248, which proposed a schedule of increased rates on private passenger automobile liability insurance in the amount of 1.5% for bodily injury insurance and 11.7% for property damage insurance, making an overall (composite) increase of 5.3%.

After due advertisement, the Commissioner, on September 16, 1969, conducted a public hearing, which was continued to and resumed on September 18, 1969. It was then continued to and resumed on October 6, 7, 9, 14 and 15, and November 12, 1969. It was concluded on November 18, 1969.

Prior to the hearing, to wit, on September 15, 1969, the Attorney General, as authorized by Chapter 535, Session Laws of 1969, intervened in behalf of "the insurance consuming public," and denied that "a rate increase for private passenger liability insurance is necessary or justified at this time."

At the hearing, the evidence presented by the Rate Office consisted of numerous exhibits and the testimony of its General Manager, Paul Mize, and of John C. Jeffries and J. Robert Hunter. The Commissioner called as witnesses George Edward King, Chief Fiscal Examiner, and Robert Holcombe, Assistant Fire and Casualty Actuary, both of the staff of the North Carolina Department of Insurance. The Attorney General offered no evidence. Statements presented by individual members of the public are not material to the present appeal.

In his order of December 18, 1969, which comprises eleven pages of the record, the Commissioner, after preliminary re-

citals, made certain "Findings of Fact," stated "Conclusions," and approved an increase in the rate level of 2.8% effective on and after January 28, 1970. He denied the requested overall rate level increase of 5.3%. The Attorney General excepted to the Commissioner's order and, in his petition for review, set forth ten assignments of error and prayed that "the Court set aside the Decision and Order of the Insurance Commissioner approving a 2.8% rate increase and cause this matter to be remanded to the Insurance Commissioner with instructions that the 1969 Filing of the Rate Administrative Office be denied in its entirety *for want of competent evidence.*" (Our italics.)

The Rate Office excepted to those portions of the Commissioner's order which denied the overall increase of 5.3% requested in its filing of July 1, 1969.

The judgment entered by Judge Bailey overruled the exceptions and assignments of error set forth in the petitions for review filed by the Attorney General and the Rate Office, respectively, and affirmed in its entirety the Commissioner's order of December 18, 1969.

The Attorney General excepted to the judgment entered by Judge Bailey and gave notice of appeal. The Rate Office did not appeal.

In the Superior Court and in the Supreme Court the North Carolina Fire Insurance Rating Bureau sought and received permission to appear and file a brief and to argue as *amicus curiae.*

*Attorney General Morgan, Deputy Attorney General Benoy and Assistant Attorneys General Rosser and Hudson, appellant intervenor.*

*Allen, Steed & Pullen, by Arch T. Allen, for North Carolina Automobile Rate Administrative Office.*

*William T. Joyner for North Carolina Fire Insurance Rating Bureau, amicus curiae.*

BOBBITT, Chief Justice.

### STATUTORY FRAMEWORK

General Statutes of North Carolina, Chapter 58, known as "the Insurance Law," G.S. 58-1, is composed of seven sub-

chapters and is set forth on pages 346-592, both inclusive, of Vol. 2B, Replacement 1965.

In Subchapter I, the Insurance Department is established "as a separate and distinct department," G.S. 58-4, and the "Commissioner of Insurance" is designated the chief officer thereof, G.S. 58-5. Subchapter I contains provisions which set forth powers and duties of the Commissioner. G.S. 58-9(1) confers upon the Commissioner "power and authority to make rules and regulations, not inconsistent with law, to enforce, carry out and make effective the provisions of this chapter . . . ." G.S. 58-9.2 relates to examinations, investigations and hearings conducted by the Commissioner. G.S. 58-9.3, which relates to court review of the Commissioner's orders and decisions, contains the following provision: "The order or decision of the Commissioner if supported by substantial evidence shall be presumed to be correct and proper."

It is provided that the Commissioner "shall appoint" a chief deputy commissioner, a chief actuary and "such other deputies, actuaries, examiners, clerks and other employees as may be found necessary for the proper execution of the work of the Insurance Department, at such compensation as shall be fixed and provided by the Budget Bureau." G.S. 58-7.1; G.S. 58-7.2; G.S. 58-7.3. On or before March 1st of each year, every insurance company is required to file in the office of the Commissioner a statement, sworn to by its chief managing agent or officer, showing its "business standing and financial condition" on the preceding 31st day of December. G.S. 58-21.

G.S. 58, Subchapter 5, Article 25, consisting of G.S. 58-246 through G.S. 58-248.8, relates specifically to automobile liability insurance. These provisions are codifications of Chapter 394 of the Public Laws of 1939 and amendments thereto.

The 1939 Act created and established the Rate Office. G.S. 58-246; G.S. 58-248. The Commissioner has authority to grant permission to write liability insurance for bodily injury and for property damage on private passenger automobiles only to those insurance companies or organizations which subscribe to and become members of the Rate Office. G.S. 58-247(a). Each member is entitled to one representative and to one vote in the administration of its affairs. The members elect the Governing Committee. G.S. 58-247(b). The expenses are prorated

among the members in proportion to their respective gross premium receipts. G.S. 58-247(c).

G.S. 58-247(d) provides that the Commissioner, or such deputy as he may appoint, shall be *ex officio* chairman of the Rate Office; that he shall preside over all of its meetings, including those of its Governing Committee; and that he shall "determine any controversy that may arise by reason of a tie vote between the members of the governing committee." G.S. 58-248.6 authorizes any member to appeal to the Commissioner from any decision of the Rate Office.

One of the stated objects and functions of the Rate Office is "(t)o maintain rules and regulations and fix rates for automobile bodily injury and property damage insurance and equitably adjust the same as far as practicable in accordance with the hazard of the different classes of risks as established by said bureau."

G.S. 58-248 authorizes the Commissioner "to compel the production of all books, data, papers and records and any other data necessary to compile statistics for the purpose of determining the pure cost and expense loading of automobile bodily injury and property damage insurance in North Carolina and this information shall be available and for the use of the North Carolina Automobile Rate Administrative Office for the capitulation *(sic)* and promulgation of rates on automobile bodily injury and property damage insurance." G.S. 58-248 also provides that the rate "compiled and promulgated by such bureau shall be submitted to the Commissioner of Insurance for approval and no such rates shall be put into effect in this State until approved by the Commissioner of Insurance and not subsequently disapproved."

The statutory provisions referred to above are codifications of the provisions of the 1939 Act. They authorized the Rate Office to "fix rates for automobile bodily injury and property damage insurance." However, approval of the Commissioner was required before the rates could be put into effect.

In *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440 (1944), the Supreme Court of the United States considered an appeal by the United States from a decision of the United States District Court for the Northern District of Georgia dismissing an indictment which charged the appellees, an association of nearly

two hundred private stock fire insurance companies, and twenty-seven individuals, with violations of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1 and 2). The indictment charged two conspiracies, namely, (1) a conspiracy "to restrain interstate trade and commerce by fixing and maintaining arbitrary and non-competitive premium rates on fire and specified 'allied lines' of insurance in Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia"; and (2) a conspiracy "to monopolize trade and commerce in the same lines of insurance in and among the same states." The Supreme Court reversed, basing its decision upon the holding that insurance transactions which stretch across State lines constitute interstate commerce so as to make them *subject to regulation* by Congress under the Commerce Clause. (Note: Apparently, less than five of the two hundred and forty-eight companies represented in the July 1, 1969 Filing are North Carolina corporations.)

Soon after the decision in *United States v. South-Eastern Underwriters Association, supra,* the Congress of the United States enacted legislation (Act of March 9, 1945, 59 Stat. 33, codified as 15 U.S.C.A. §§ 1011-1015), which provided, *inter alia,* that after January 1, 1948 (by amendment, June 30, 1948), the Sherman Act, the Clayton Act, and the Federal Trade Commission Act, "shall be applicable to the business of insurance *to the extent that such business is not regulated by State law."* (Our italics.)

Seemingly in response to the decision in *United States v. South-Eastern Underwriters Association, supra,* and in anticipation of the enactment of federal legislation such as that embodied in the Act of March 9, 1945, known as the McCarran-Ferguson Act, the General Assembly enacted Chapter 381 of the Session Laws of 1945, codified as G.S. 58-248.1, which provides, *inter alia:* "Whenever the Commissioner, upon his own motion or upon petition of any aggrieved party, shall determine, after notice and a hearing, that the rates charged or filed on any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, or that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the bureau directing that such rates, classifications or classification assignments be altered or revised in the manner and to the extent stated in such order to produce rates, classifications or classification assignments which are reason-

able, adequate, not unfairly discriminatory, and in the public interest." Another new section added by the 1945 Act, to wit, G.S. 58-248.5, provided that a review of any order made by the Commissioner in accordance with the provisions of G.S. 58, Article 25, which is comprised of G.S. 58-246 through G.S. 58-248.8, was by appeal to the Superior Court of Wake County in accordance with G.S. 58-9.3.

In *Allstate Insurance Company v. Lanier,* a declaratory judgment involving our statutes, G.S. 58-246 through G.S. 58-248.8 (1965), was entered in the United States District Court for the Eastern District of North Carolina, 242 F. Supp. 73 (1965), and affirmed by the Court of Appeals, 361 F. 2d 870 (4th Cir. 1966). The plaintiffs, "five large insurance companies doing 29% of the total business in North Carolina," filed the suit to obtain a judgment declaring the North Carolina statutory provisions invalid "insofar as it restricts competition by prohibiting the offering of lower premium rates." 361 F. 2d at 871. A summary judgment dissolving the complaint was affirmed on the ground that, since the Rate Office "was established and administered under the active supervision of the State, it was not subject to attack under the federal antitrust laws, which condemn only *private* noncompetitive activities," and that the North Carolina statutory provisions had not been preempted either by the Sherman Act or by the McCarran-Ferguson Act. The opinion of Circuit Judge Sobeloff concludes with this observation: "Whether the statutory plan embodies the wisest and most effective type of regulation is, of course, not a judicial question."

Prior to the enactment of Chapter 943 of the Session Laws of 1965, no statute provided for periodic filings by the Rate Office with the Commissioner of the data referred to in G.S. 58-248, to wit, "data necessary to compile statistics for the purpose of determining the pure cost and expense loading of automobile bodily injury and property damage insurance in North Carolina." This Act of 1965 incorporated in G.S. 58-248 the following: "On or before July 1 of each calendar year the . . . Rate . . . Office shall submit to the Commissioner the data hereinabove referred to for bodily injury and property damage insurance on private passenger vehicles and a rate review based on such data. Such rate proposals shall be approved or disapproved by the Commissioner . . . ."

---

---

Except as indicated below, the foregoing constitutes the statutory framework for the consideration by the Commissioner of the Rate Office's filing of July 1, 1969.

### STATISTICAL DATA

Regulation 21, made and promulgated by the Commissioner, provides, *inter alia:*

"Bureaus and companies to which the provisions of Article 25, entitled Regulation of Automobile Liability Insurance Rates, (apply) are requested to file all rate manuals, classification plans, rating plans, rating schedules, rating rules and statistical plans proposed to be used in North Carolina, relating to: Automobile Liability Coverages.

"Statistical agents for the various regulated lines are hereby appointed as follows:

1. Mutual Insurance Rating Bureau

2. Insurance Rating Board

3. National Association of Independent Insurers

4. National Independent Statistical Service

"These bureaus will annually collect and compile all experience data, prepare the necessary experience exhibits for rate making purposes and make such filings as may be required."

The Mutual Insurance Rating Bureau (MIRB) and the Insurance Rating Board (IRB) are licensed rate-making bureaus in many States. They are approved Statistical Agents in all States. The National Association of Independent Insurers (NAII) and the National Independent Statistical Service (NISS) are approved Statistical Agents for their member companies but are not licensed rate-making bureaus.

The testimony of Paul Mize, General Manager of the Rate Office, was to the effect that each of the licensed companies (then 251) is required to submit at regular intervals a statistical report, accompanied by a transmittal letter and affidavit from an official of the company, to one of the four designated statistical agents in accordance with a statistical plan or code approved by the Commissioner. According to Mize, these reports set forth in required detail the company's exposures, including the number of cars insured and the coverages, the amount of

the premiums, and the amounts of paid and outstanding claims. The data is checked by experienced employees of the Statistical Agent to correct errors and to insure conformity to the approved statistical plan or code. "The data is then tabulated on high-speed electronic computers and the tabulations are then filed with the Commissioner of Insurance and made available to the North Carolina Automobile Rate Administrative Office." The filing of July 1, 1969, submitted by the Rate Office to the Commissioner, was prepared under the supervision of Mize by direction of the Governing Committee of the Rate Office.

Every licensed company, irrespective of its size or the extent of its business in North Carolina, has equal representation and vote in the Rate Office. The data furnished the Rate Office by the Statistical Agents does not disclose the experience of any one company. It reflects the aggregate or composite experience of all licensed companies as if this were the experience of a single company. The statistical data submitted to it by the Statistical Agents is used by the Rate Office in preparing its July 1 Filing.

### THE JULY 1, 1969 FILING

The private passenger automobile liability insurance rates in effect since April 9, 1969, are those approved by the Commissioner by order of March 20, 1969, as a result of the July 1, 1968 Filing submitted by the Rate Office. This 1968 Filing was based (mainly) on experience during 1965 and 1966.

On May 20, 1969, the Governing Committee of the Rate Office, after reviewing the statistical data compiled and furnished to it by the Statistical Agents adopted a schedule providing for an increase of 1.5% in the rates applicable to bodily injury insurance and an increase of 11.7% in the rates applicable to property damage insurance, or an overall (composite) increase of 5.3%. The July 1, 1969 Filing set forth the proposed increases, the experience and reasons asserted in justification thereof, and sought the approval of the proposed increases by the Commissioner. This 1969 Filing was based (mainly) on experience during 1966 and 1967.

Mize testified that the figures showing the effect of the proposed increases were based on the old manual rates or policy limits of 5/10/5 despite the fact a policy written or renewed after January 1, 1968, was required to have minimum limits of 10/20/5 to serve as proof of financial reponsibility (G.S. 20-309)

under G.S. 20-279.21. He explained that "the Rate Office had no actual experience on the 10/20/5 limits through the year 1967."

The rate-making process on which the 1969 Filing was based is substantially the same as that used as a basis for the filing in 1968 and prior years.

The 1969 Filing asserts as justification for the proposed increases that, during the years 1966 and 1967, weighted equally, the companies incurred losses ($151,733,706.00) in excess of premiums provided for losses ($141,146,346.00) in the amount of $10,587,360.00. In explanation, it was asserted: (1) That the increase in motor vehicle accidents was greater than the increase in automobile registrations; and (2) that the increase in accident frequency was compounded by the increases in claim settlements, attributable to increases in medical and hospital costs, wage losses, automobile labor repair charges, and the prices of automobile parts necessary to make repairs.

If the Commissioner determines, after a hearing, that the rates proposed by the Rate Office "are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest," it becomes his duty to issue an order to the Rate Office directing that the proposed rates "be altered or revised in the manner and *to the extent stated in such order* to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest." (Our italics.) G.S. 58-248.1.

In his order of December 18, 1969, the Commissioner altered or revised the proposals of the Rate Office in two particulars, *viz.:* First, he adopted a different methed for calculating the "factor to adjust losses" in determining the expense to be allocated for the payment of pending claims; and second, he found that the Rate Office "did not take into direct consideration the effect of investment income from unearned premium reserves." See G.S. 58-246 (5). On these grounds, the Commissioner did not approve the overall increase of 5.3% requested in the 1969 Filing but did approve an increase of 2.8% to become effective on and after January 28, 1970.

## THE EVIDENCE

The Rate Office relied on the data furnished to it by the Statistical Agents to support its assertion that the losses during 1966 and 1967 had exceeded the proportion of the premiums

allocated for the payment of losses under the then existing rates. It relied upon data it had obtained from the North Carolina Motor Vehicle Department to show the increase in motor vehicle accidents was greater than the increase in automobile registrations. It relied upon data obtained from the Consumer Price Index, Medical Care Sector, United States Department of Labor, to show the increase countrywide in hospital charges and physicians' fees. It relied upon data obtained from the Bureau of Labor Statistics, U. S. Department of Labor, to show the increases in the United States and in North Carolina in the weekly gross earnings of production workers engaged in manufacturing. It relied upon data obtained from National Market Reports, Inc., to show the increases in the prices of automobile repair parts. It offered the testimony of John C. Jeffries, who is engaged in the independent automobile damage appraisal business, to show the increase in automobile labor repair charges.

### THE RATE-MAKING PROCEDURE

Since the Act of 1965, G.S. 58-248 has required the Rate Office *to submit to the Commissioner* the data "hereinabove referred to" for bodily injury and property damage insurance on private passenger vehicles and a rate review based on such data. The data "hereinabove referred to" consists "of all books, data, papers and records and any other data *necessary to compile statistics for the purpose of determining the pure cost and expense loading of automobile bodily injury and property damage insurance in North Carolina . . . .*" (Our italics.)

"For rate-making purposes, the components of a casualty insurance premium are the 'pure premium' and 'expense loading.' The 'pure premium' is the amount allocated for the settlement of casualty losses, including loss adjustment expenses. 'Expense loading' is the amount allocated for operating expenses and for underwriting profit and contingencies." *Virginia State AFL-CIO v. Commonwealth,* 209 Va. 776, 167 S.E. 2d 322 (1969).

The increases proposed by the Rate Office in its 1969 Filing are based on an allocation of 68.6% of the premium dollar to "Losses and Loss Adjustment Expenses" and the remaining 31.4% to "Expense Loading." The 31.4% is composed of the following items: Production cost, 16.8%, which is a composite of 10% for assigned risks and 20% for voluntary risks; gen-

eral administration, 5.5%; taxes, licenses and fees, exclusive of federal income taxes, 3.1%; inspection and bureau fees, 1%; and underwriting profit and contingencies, 5%.

A contingency contemplated in the allowance of 5% for "underwriting profit and contingencies" is federal income tax, approximately 50% of a company's net profit, if any.

The 68.6% allocated to "Losses and Loss Adjustment Expenses" is based on 1966 and 1967 experience as reported by the Statistical Agents upon their analysis of the reports submitted to them by all licensed companies. It is noteworthy that this proportion was greater than that on which prior filings have been based, thus leaving a smaller total percentage for allocation to "Expense Loading."

It does not appear that the licensed companies, in their reports to the Statistical Agents or otherwise, supplied data as to their actual experience in North Carolina in 1966 and 1967 with reference to the items constituting "Expense Loading." The Rate Office offered evidence that each of these allocations was reasonable and in line with allowances recognized as reasonable throughout the country. This evidence consisted of the opinion evidence of Mize, Holcombe and Hunter, and of statistics as to similar allowances approved elsewhere in the country.

The record contains no statistical or other evidence as to the profits and losses in North Carolina in 1966 and 1967 of any or all of the companies licensed to write automobile liability insurance in this State.

The evidence includes the tabulation by the Insurance Rating Board as of September 3, 1969, of the automobile liability insurance rates in effect in the twenty-five eastern States according to the latest information then obtainable. In this tabulation, North Carolina is twenty-third, the only *lower* rates being those of Delaware and of Georgia. Too, this tabulation indicates that the North Carolina rates are approximately 30% lower than the average of the rates in the twenty-five eastern States. The evidence does not disclose when, from whom or the circumstances under which the Insurance Rating Board obtained the information from which its tabulation was prepared.

### ABSENCE OF LEGISLATIVE STANDARDS

If the Commissioner, after a hearing, determines that "the rates charged or filed . . . are excessive, inadequate, unreason-

able, unfairly discriminatory, or otherwise not in the public interest," G.S. 58-248.1 provides that "he shall issue an order . . . directing that such rates . . . be altered or revised in the manner and *to the extent stated in such order* to produce rates . . . which are reasonable, adequate, not unfairly discriminatory, and in the public interest." (Our italics.) However, no legislative provision purports to define what constitutes a "reasonable rate" or provides a formula or standards for the guidance of the Commissioner in the determination thereof.

[1] We pass, without discussion, questions relating to the power of the General Assembly to fix the rates for automobile liability insurance. It is noteworthy that a casualty insurance company, unlike a public utility, has no monopolistic or exclusive rights. All of the 251 competing companies are required to issue policies at the rate fixed by a State agency as a condition of doing business in North Carolina. Suffice to say, the only power the Commissioner has to fix rates is such power as the General Assembly has delegated to and vested in him.

"It is settled and fundamental in our law that the Legislature may not abdicate its power to make laws nor delegate its *supreme* legislative power to any other coordinate branch or to any agency which it may create. *Coastal Highway v. Turnpike Authority*, 237 N.C. 52, 74 S.E. 2d 310. It is equally well settled that, as to some *specific* subject matter, it may delegate a *limited* portion of its legislative power to an administrative agency *if* it prescribes the standards under which the agency is to exercise the delegated powers." *Turnpike Authority v. Pine Island*, 265 N.C. 109, 114, 143 S.E. 2d 319, 323, and cases there cited.

For present purposes, it is sufficient to say that no question is presented in the Attorney General's petition for review of the Commissioner's order of December 18, 1969, as to the power of the General Assembly or of the Commissioner to fix rates. The arguments brought forward assume the existence of such power.

In the absence of a legislative formula or standards, the Commissioner has had no alternative but to look to the rate-making procedures recognized in the industry and in other States. The words, "pure cost" and "expense loading" as used, without explanation, in G.S. 58-248, facilitated this course. Thus,

the Rate Office and the Commissioner adopted the industry view that the reasonableness of a profit to be allowed to a company writing automobile liability insurance was determinable on the basis of a percentage of the gross premium rather than on the basis of a rate of return on invested capital. Underlying this view is the fact that the required capital assets of a casualty insurance company are primarily reserves to guarantee its ability to discharge its liability rather than for use as working capital in the prosecution of its business. Such a company has no significant inventory of assets which are used and useful in the prosecution of its business. The primary function of such a company is to render a service. It is noted that the 5% of premium allowed for underwriting profit and contingencies in computing the rates proposed by the 1969 Filing is the same as that used in preceding filings and is the same as that generally approved in the industry.

### SCOPE OF REVIEW

[2]   The case is before us upon the ten assignments of error set forth in the Attorney General's petition for review by the Superior Court of the Commissioner's order of December 18, 1969. These assignments challenge all findings of fact in the Commissioner's order on the ground they were based wholly or principally on incompetent testimony and unauthenticated and otherwise incompetent documentary evidence. At the hearing(s), the Attorney General objected to practically all of the evidence offered by the Rate Office and excepted to the overruling of his objections. He contended the provisions of Chapter 930 of the Session Laws of 1967, codified as G.S. 143-317 and G.S. 143-318, were applicable in determining the competency of evidence at the hearing(s) before the Commissioner, and that the bulk of the evidence offered by the Rate Office was incompetent under "(t)he rules of evidence as applied in the superior and district court divisions of the General Court of Justice."

The Attorney General's petition for review of the Commissioner's order of December 18, 1969, brought the matter to the Superior Court for hearing on the assignments of error set forth in that petition. We are concerned only with that portion of Judge Bailey's judgment which overrules these assignments of error and affirms the Commissioner's order.

In re Filing by Automobile Rate Office

## THE 1967 ACT

The 1967 Act, as codified, is quoted below:

"§ 143-317. Definitions.—As used in this article,

(1) 'Administrative agency' means any State authority board, bureau, commission, committee, department, or officer authorized by law to make administrative decisions, except those agencies in the legislative and judicial departments of government, the North Carolina Utilities Commission, the North Carolina Industrial Commission, the Employment Security Commission of North Carolina, and the institutions and agencies that operate pursuant to chapters 115, 115A, and 116 of the General Statutes.

(2) 'Party' means each person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party.

(3) 'Proceeding' shall mean any proceeding, by whatever name called, before an administrative agency of the State, *wherein the legal rights, duties, or privileges of specific parties are required by law or by constitutional right to be determined after an opportunity for agency hearing.* (Our italics.)

"§ 143-318. Rules of evidence official notice.—In all proceedings:

(1) *Incompetent,* irrelevant, immaterial, unduly repetitious, *and hearsay evidence* shall be excluded. *The rules of evidence as applied in the superior and district court divisions of the General Court of Justice shall be followed.* (Our italics.)

(2) Documentary evidence may be received in the form of copies or excerpts, if the original is not readily available. Upon request, parties shall be given an opportunity to compare the copy with the original.

(3) Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff

memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

These facts are noted: In *In re Filing by Fire Ins. Rating Bureau,* 275 N.C. 15, 165 S.E. 2d 207, no question was raised as to the applicability of the 1967 Act to the evidence then offered by the North Carolina Fire Insurance Rating Bureau in support of its proposal for increased rates on fire insurance policies. Nor does it appear that any question was raised as to the applicability of the 1967 Act to the evidence offered by the Rate Office in support of its proposals filed July 1, 1967, and July 1, 1968, on private passenger automobile liability insurance policies. In these proceedings, the Attorney General appeared as counsel for the Commissioner. In the present proceeding, the Attorney General, as authorized by Chapter 535 of the Session Laws of 1969, intervened and appeared "in a representative capacity for and on behalf of the using and consuming public of this State." Understandably, when so intervening and appearing, the Attorney General deemed it his duty to assert the applicability of the 1967 Act to rate-making proceedings before the Commissioner and obtain an authoritative ruling thereon.

G.S. 58-27.1 provides that "(t)here shall be in the Insurance Department an insurance advisory board which shall consist of seven members." It designates the Commissioner "a member of the board and its chairman and executive head." It provides for the appointment by the Governor of the remaining six members. It provides that the Insurance Advisory Board "shall . . . promulgate rules and regulations to provide for the holding of public hearings before the Commissioner . . . on such proposals, to revise an existing rating schedule the effect of which is to increase or decrease the charge for insurance or to set up a new rating schedule, as are subject to the approval of the Commissioner and as, in the judgment of the board, are of such nature and importance as to justify and require a public hearing."

Pursuant to G.S. 58-27.1, the Insurance Advisory Board adopted rules and regulations for such public hearings by the Commissioner, which rules and regulations were filed with the Secretary of State on March 1, 1950. Section 6 thereof is quoted below.

"6. Public hearings shall be conducted in an orderly but informal manner. *The hearing officer shall admit all evidence of any type having reasonable probative value,* and shall include in the evidence any relevant or material evidence which may be made available to him by any records of the Insurance Department or disclosed by any investigation or study of the problem by personnel of the Department. Irrelevant, immaterial or unduly repetitious evidence shall be excluded. *Any evidence of the type upon which responsible persons are accustomed to rely in the conduct of insurance affairs shall be deemed to have reasonable probative value.* A hearing may be continued when such continuation is, in the Commissioner's judgment, warranted." (Our italics.)

It is noted that both G.S. 58-27.1 and the rules and regulations adopted by the Insurance Advisory Board relate specifically and solely to public hearings before the Commissioner on proposals to revise insurance rates.

We are of opinion, and so hold, that the 1967 Act, now codified as G.S. 143-317 and G.S. 143-318, is not applicable to a public hearing before the Commissioner on proposals for a general revision of insurance rates submitted by a statutory rate-making bureau such as the Rate Office. The rates approved or fixed by the Commissioner apply equally to all companies licensed to issue and to all persons who obtain liability insurance on private passenger automobiles. The statutes, G.S. 143-317 and G.S. 143-318, are applicable only to a "proceeding" before an administrative agency *"wherein the legal rights, duties, or privileges of specific parties* are required by law or by constitutional right to be determined after an opportunity for an agency hearing." (Our italics.) G.S. 143-317(3). The quoted portion of G.S. 143-317(3) shows that G.S. 143-318 was intended to apply only to hearings which might result in a loss by a specific party of some legal right, duty or privilege, such as hearings relating to the revocation of the license of a specified insurance agent (G.S. 58-42, G.S. 58-248.3) or of a specified insurance company (G.S. 58-44.4, G.S. 58-248.3) or to the imposition of a fine or penalty (G.S. 58-262) upon an insurance agent or insurance company for violation of the "Insurance Law." Such hearings involve the essential elements of a court trial. In such cases, the Attorney General, as legal adviser to the Commissioner, can provide counsel as to whether proffered evidence complies with "(t)he rules

of evidence as applied in the superior and district court divisions of the General Court of Justice."

[3]   G.S. 143-317 and G.S. 143-318 apply only to judicial or quasi-judicial proceedings. The power to fix rates effective from a specified future date, which G.S. 58-248 purports to delegate to the Commissioner, is a legislative power. This is no less true because its exercise is preceded by investigations and hearings. In *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 53 L. Ed. 150, 29 S.Ct. 67 (1908), which involved proceedings before a Virginia Commission to establish railway passenger rates for the future, Mr. Justice Holmes said: "But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which, at another moment, or in its principal or dominant aspect, is a court . . . . A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind . . . ." As stated in *In re Filing by Fire Ins. Rating Bureau, supra* at 32, 165 S.E. 2d at 219: "In fixing by law the premium rate, it is the legislative power of the State which is being exercised."

There were no specific parties to the public hearing before the Commissioner. In submitting the 1969 Filing, the Rate Office, a statutory bureau, was engaged in the performance of the duty imposed upon it by G.S. 58-248. The proposals embodied in the 1969 Filing were in accordance with the determinations and directions of the Governing Committee. Although each of the two hundred and fifty-one licensed companies had an equal vote in the selection of the Governing Committee, nothing in the record indicates the proposal embodied in the 1969 Filing represent the views or have the approval of any specific insurance company. It would seem that the plaintiffs in *Allstate Insurance Company v. Lanier, supra,* were seeking an opportunity to fix their own rates and be free from the necessity of conforming to the rate proposals and presentation thereof as made by the Rate Office.

### SUFFICIENCY OF THE EVIDENCE

[4]   We agree with the Attorney General that much of the testimony and documentary evidence produced at the hearing (s) did not meet the tests required for the admissibility of evidence over objection thereto in a trial in a Superior or District Court. However, we think the evidence produced was "of the type upon which responsible persons are accustomed to rely in the conduct of insurance affairs" and was for consideration by the Commissioner in connection with his approval or fixing of rates to be effective from some future date. Too, in making what must be considered in large measure a policy or judgment decision, the Commissioner had the benefit of his own continuous study and knowledge of changing conditions, including the enactment of Chapter 215, Session Laws of 1969, which rewrote G.S. 28-174 relating to the damages recoverable in wrongful death actions. Without elaboration, it is noted that, as shown by his rulings in connection with the 1967 and 1968 Filings by the Rate Office, the Commissioner has held a tight rein with reference to any proposed increase of rates.

The opinion testimony of Mize, Hunter and Holcombe supports the Commissioner's decision and order of December 18, 1969. Each of these men has had extensive experience and is well informed with reference to liability insurance rates on private passenger automobiles in North Carolina and throughout the country, including the percentages allocated to "pure cost" and to each of the various items included in "expense loading."

Mize has been connected with the Rate Office since 1950 and has been General Manager thereof since February, 1968. He has testified "a good many times in prior automobile liability insurance rate cases before the Commissioner of Insurance." His work has kept him in close touch with automobile statistical data, compilations and automobile liability insurance rates.

Hunter's experience includes employment by the Insurance Rating Board and by the Mutual Insurance Rating Bureau. These bureaus are licensed as Statistical Agents in all States and as Rating Organizations in most States, though not in North Carolina, for automobile liability insurance. In his present position as Assistant Actuary of MIRB, Hunter supervises the preparation of rate revisions in all States where MIRB is licensed as a Rating Organization.

Holcombe, for the past thirteen years, has been employed by the North Carolina Department of Insurance as Assistant Fire and Casualty Actuary. His work involves a critical review of filed material. This includes an analysis of the accounting and statistical methods, practices and procedures used by insurance companies as they relate to automobile liability insurance rates in North Carolina. It was stipulated that he was an expert "in rate analysis."

## DATA REQUIRED BY G.S. 58-248

[5]   The record contains no exhibit or testimony that shows precisely what data each company is required to submit to the Statistical Agent to which it reports. The data required and supplied seems sufficient as to the "pure cost" component of the rate. It falls short of that required to reflect the experience *in North Carolina* as to the "expense loading" component of the rate. Mr. Mize testified: "Countrywide experience is the only experience available. Related to automobile liability insurance specifically, no expense statistics, data, or experience is available for operations solely in the State of North Carolina." As stated above, the data required and supplied does not reflect a reporting company's underwriting profit and loss experience in North Carolina. We are mindful that items such as production costs, administration costs, etc., may consist in part of expenditures elsewhere than in North Carolina, *e.g.,* home office expenses. Even so, G.S. 58-248 contemplates that each company furnish data based on North Carolina experience with reference to the items composing "expense loading" as well as those composing "pure cost." Whether this requirement is reasonable or will prove of substantial value is for legislative determination. The Rate Office and the Commissioner should take notice that, under present statutory provisions, each company should be required to provide all of the data required by G.S. 58-248.

## CONCLUSION

[6]   As indicated, the data supplied by the companies to the Statistical Agents falls short of that required by G.S. 58-248. Even so, we think the uncontradicted evidence sufficient to support the Commissioner's allowance of the overall increase of 2.8% (instead of the 5.3% increase proposed by the Rate Office) notwithstanding the failure to comply with all requirements of G.S. 58-248.

It is noted that the Rate Office has made its July 1, 1970 Filing and soon will be required to make its July 1, 1971 Filing.

We are of opinion that Judge Bailey's judgment, which affirms the Commissioner's order of December 18, 1969, should be, and it is hereby, affirmed.

Affirmed.

Justice LAKE dissenting.

With reference to the findings of fact which the Commissioner of Insurance must make in a proceeding to fix the premium rates, there is no difference between fire insurance and automobile liability insurance. In reviewing an order by the Commissioner, fixing premiums for fire insurance policies, this Court said:

> "The ultimate question to be determined by the Commissioner is whether an increase in premium rates is necessary in order to yield a 'fair and reasonable profit' in the immediate future (i.e., treating the Bureau as if it were an operating company whose experience in the past is a composite of the experiences of all the operating companies), and, if so, how much increase is required for that purpose. This cannot be determined without specific findings of fact, upon substantial evidence, as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same period, and (3) the per cent of Earned Premiums which will constitute a 'fair and reasonable profit' in that period." *In re Filing by Fire Insurance Rating Bureau,* 275 N.C. 15, 39, 165 S.E. 2d 207.

In the present case, the Commissioner has not made any finding as to items (2) and (3). Without such preliminary findings of fact, his declaration "that the present rates for private passenger automobile liability insurance are inadequate" and his declaration "that the record shows and the statistics support the need for some rate relief for private passenger automobile liability insurance in North Carolina" are not findings of fact, but are mere administrative declarations which no court can review intelligibly. To affirm an order fixing premium rates upon a mere administrative declaration that the old rates are "inadequate" and the new ones are "reason-

able" subjects both the public and the insurance carriers to the danger of arbitrary action by the Commissioner. It is to guard against that danger that the duty of judicial review is imposed upon us by G.S. 58-9.3. We may not properly avoid it by merely accepting the Commissioner's declarations because of our confidence in his superior knowledge of the field.

G.S. 58-248.1 provides: "Whenever the Commissioner * * * shall determine, after notice and a hearing, that the rates charged or filed * * * are excessive, inadequate, unreasonable * * * or otherwise not in the public interest * * * he shall issue an order to the bureau directing that such rates * * * be altered or revised * * * to the extent stated in such order to produce rates * * * which are reasonable, adequate * * * and in the public interest."

G.S. 58-248.5 provides: "A review of any order made by the Commissioner * * * shall be by appeal to the Superior Court of Wake County in accordance with the provisions of § 58.9.3." G.S. 58.9.3 provides for judicial review of any order of the Commissioner except one to make good an impairment of capital or surplus or a deficiency in the amount of admitted assets. Consequently, the judicial review which it is our duty to make in the present case is precisely the same as that which we must make of an order fixing premium rates for fire insurance. *In re Filing by Fire Insurance Rating Bureau, supra,* is, therefore, applicable to the present case.

G.S. 58-9.3(a) specifically recognizes the right of any person aggrieved by an order of the Commissioner to obtain a judicial review of its merits. Obviously, it does not contemplate that the reviewing court will make its own findings of fact concerning what per cent of earned premiums will constitute a fair and reasonable profit or what operating expenses are reasonably to be anticipated in the period in which the premium rates are to be in effect. The reviewing court is charged by G.S. 58-9.3(b) with the duty of reviewing findings of fact made by the Commissioner. To enable it to do so, this statute requires the Commissioner to file with the court a complete transcript of the record of the hearing before him. The statute states that the order of the Commissioner "if supported by substantial evidence" shall be presumed to be correct. Obviously, the statute contemplates that the reviewing court is to determine whether there is substantial evidence in the record to

support the Commissioner's findings of fact which are essential to his ultimate finding that the rates are excessive or inadequate, reasonable or unreasonable.

Before this ultimate finding can be made and reviewed there must be findings by someone as to the earned premiums to be anticipated by the company (*i.e.,* all companies operating in North Carolina considered as one), the anticipated payments to be made on account of claims, the anticipated operating expenses and what is a reasonable and fair profit. Clearly, the statute does not contemplate that the reviewing court will make its own findings of fact as to these matters. The judicial review contemplated by the statute cannot be had unless the Commissioner's findings on these preliminary matters are set forth in his order. In the present case, such findings are not set forth in the order of the Commissioner.

In the present case, it is the rate payers, represented by the Attorney General, who appealed. *In re Filing by Fire Insurance Rating Bureau, supra,* was an appeal by the companies, represented by the Rating Bureau. To affirm an order of the Commissioner fixing premium rates when, as here, the Court does not have before it these essential preliminary findings of fact by the Commissioner is to expose both the rate payers and the companies to the danger of arbitrary rate making by the Commissioner. How can this Court review the Commissioner's findings that the former rates are inadequate and the rates now fixed by him are reasonable when we do not know what profit either schedule of rates will produce and do not know what profit the Commissioner deems reasonable? This Court should remand this matter to the Commissioner with instructions comparable to those given in the case of the Fire Insurance Rating Bureau, *supra.*

Furthermore, there is not in the present record evidence sufficient to support findings of fact upon these essential preliminary questions. No exhibit and no testimony in the record before us shows: (1) The total amount of earned premiums anticipated in a 12 month period, either from the present rates or from the proposed rates, when applied to the number of vehicles registered at the time of filing; (2) the total amount of company expenses, other than payment of losses and expenses related to the payment of losses, attributable to North Carolina

business in such period; or (3) the total amount of profit or loss anticipated under either the present rates or the proposed rates.

An exhibit filed by the Rate Office shows in precise figures the bodily injury and property damage losses actually incurred by the companies in North Carolina in the two test years, within the minimum coverage limits; that is, payments on claims and expenses incurred in settling them. By *pro forma* adjustments, apparently proper, the Rate Office computed that such losses and loss adjustment expenses amounted to 68.6 cents of each earned premium dollar under the then present rates. This is a figure which purports to show the actual expenditures by the companies, attributable to their North Carolina business for the payment of losses and expenses relating thereto. Nothing in the record casts doubt upon its substantial accuracy.

Obviously, an insurance company has other expenses. The Rate Office breaks these down into four types: Production Costs; General Administration; Taxes, Licenses, Fees; and Inspection and Bureau. However, instead of showing the amounts actually expended during the test period, in or attributable to North Carolina, for these items, as it did in the matter of losses and expenses related thereto, the evidence of the Rate Office merely allocates to each of these items a specified percentage of the premium dollar, these allocations being: Production Costs 16.8%; General Administration 5.5%; Taxes, Licenses, Fees 3.1%; and Inspection and Bureau 1.0%, making a total for the four items of 26.4 cents out of each earned premium dollar. Adding this to the 68.6 cents of the premium dollar, computed from actual experience as the amount paid for losses and expenses relating thereto, the total was 95 cents out of the earned premium dollar. This, says the Rate Office, leaves 5 cents of each earned premium dollar for "underwriting profit and contingency." Of this, income taxes will consume 2.6 cents, leaving 2.4 cents for addition to surplus or declaration of dividends.

When expressed in terms of 2.4 cents per premium dollar, the net profit after taxes, and, of course, after the payment of all losses and expenses, seems trivial. The actual fact is quite to the contrary. In 1967 the earned premiums just from the then minimum coverages of $5,000 for bodily injury to one person, $10,000 for all injuries in a single accident, and $5,000 for property damage totaled $113,424,348. Since that time, the mini-

mum coverage has been increased by statute and, according to the evidence of the Bureau, there has been an increase of 7% each year in the number of vehicles registered in the State, which means a substantial increase in the earned premiums without any increase in the rate. Even on the 1967 total earned premiums a profit of 2.4 cents per premium dollar would be $2,722,184 annually after taxes. Thus, we are not here concerned with trivial amounts. When the increase in profit of only a fraction of a cent per dollar of earned premiums amounts to so large a sum, by reason of the tremendous volume of business done, the public interest, as well as fair treatment of investors in insurance company securities, requires that the Commissioner abstain from fixing rates on the basis of rough estimates and guess.

The Rate Office in the present case has offered no evidence to show the actual expenses of the companies for production costs, or for general administration expense, attributable to North Carolina business. If each of these items has been overstated by as little as one cent per premium dollar, the amount actually remaining for underwriting profit would, necessarily, be increased by two cents of each earned premium dollar, which would amount to a very large sum, indeed, upon the total business done in this State.

It is essential to proper rate making that the expenses of the company, as well as its payments upon claims, be computed accurately on the basis of North Carolina experience, not just approximated on the basis of a hypothetical or theoretical allocation of the earned premium dollar as was done by the Rate Office and accepted by the Commissioner in this case.

The testimony of the witnesses for the Rate Office shows that they arrived at their computation of the allocation of the earned premium dollar to these expenses not from North Carolina experience, but from "countrywide expense experience" of all members of the Insurance Rating Board, one of the statistical agents. This "countrywide experience" not only relates to experience of insurers outside this State but includes the experience of companies not doing any business in North Carolina at all and excludes the experience of those who do operate here but report to a different statistical agent.

Furthermore, to predicate a rate increase on the premise that the expense of the insurance companies for General Administration varies in direct proportion to the premium receipts, as

In re Filing by Automobile Rate Office

the Rate Office and the Commissioner have done, strains credulity beyond the breaking point. Salaries of filing clerks, secretaries and administration officers of the company are not fixed on this basis and neither are office rent and many other expenses of the home office and regional office operations. To conclude from this "countrywide experience" that the General Administration expense of the companies attributable to their North Carolina business has been or will be 5.50% of the earned premium dollar in this State, irrespective of what the premium rate is, is sheer approximation in an area where an error of a fraction of one per cent results in a substantial variation of the amount remaining for profit. A finding on such a basis that the present rates are "inadequate" is not a finding supported by substantial evidence in the record.

The statistical exhibits filed by the Rate Office in this case showing the actual payments on claims and claim adjustment expense, based upon actual North Carolina experience, demonstrates that these companies can compile accurate data with reference to their expense experience attributable to their business in this State alone. It is not unreasonable to require these companies to assume the task of allocating to the respective states they serve the appropriate shares of their general expenses. The statutory plan for insurance rate making adopted by this State contemplates that the Commissioner of Insurance will require such proof before authorizing an increase in the premium rates for liability insurance policies issued to the residents of this State.

There are substantial differences between North Carolina and other states in regard to automobile liability insurance. This is a compulsory insurance state. Few of the other states are. The companies have in North Carolina a captive market. Not only does this greatly increase the volume of business, which usually affects the profit necessary per unit of sale, but it also tends to reduce the sales promotion cost per policy. On the basis of "countrywide experience" the Rate Office allocated, and the Commissioner accepted, 16.8 cents of each premium dollar in North Carolina to Production Expense. If this allocation is only one cent too high, as applied to North Carolina, the result is a concealment in "Expense" of more than $1,000,000 in profit.

It is quite true that in North Carolina the companies must issue assigned risk policies. This, no doubt, tends to increase the hazard, per policy, but on the Rate Office's own evidence,

the total of all payments for losses and loss adjustment expense, including the assigned risks, is only 68.6 cents of each earned premium dollar under the rates in effect prior to the order here in question. How much of the remaining 31.4 cents of each earned premium dollar is actual profit should be determined on the basis of actual North Carolina expenses incurred, not on the basis of "countrywide experience."

Assuming that the actual profit derived by the companies from their North Carolina business has been determined accurately, the question remains, is this a fair and reasonable profit? This can be determined only in the light of the ratio of profits to gross sales in other businesses of comparable risk. A reviewing court is not the proper body to determine that question. That determination should be made by the Commissioner. He has not done so in this case.

There is in the record no substantial evidence to support a finding by the Commissioner upon this question. Assuming that an expert insurance actuary is also an expert in the matter of determining a fair rate of profit, which in my opinion does not follow necessarily, a finding by the Commissioner that a certain rate of profit is reasonable requires for its support more than the mere assertion by an expert witness that it is so. In McCormick on Evidence, § 12, it is said:

"Undoubtedly there is a kind of statment by the witness which amounts to little more than an expression of his belief as to how the case should be decided or as to the amount of damages which should be given or as to the credibility of certain testimony. Such extreme expressions as these all courts, it is believed, would exclude. There is no necessity for such evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for a decision to the witnesses."

This statement is equally applicable to an administrative officer, such as the Commissioner of Insurance, when conducting an inquiry into the reasonableness of a rate of profit.

North Carolina, being a compulsory insurance state, is relatively unique among the states of the Union. Consequently, the mere statement that a certain rate of profit is allowed, or accepted, in other states is not substantial evidence that it is a fair and reasonable rate of profit in this State. This is especially so in the total absence of any evidence as to which other states

have so determined and as to how and by whom their determinations were made.

The majority opinion appears to proceed from the position, indicated in its statement of the facts, that the Attorney General raised no point other than the competency of evidence admitted over his objection.

The fourth assignment of error in the petition for review filed by the Attorney General in the Superior Court reads as follows:

"(4) That the Commissioner erred in overruling the Attorney General's motion to dismiss made at the end of the Rating Bureau's evidence and again at the end of all the evidence on the ground that there was not sufficient competent evidence to support any part of the suggested rate increase."

Since the first three assignments of error in the petition for review were directed specifically at the alleged errors of the Commissioner in overruling the Attorney General's objections to testimony and exhibits offered by the Rate Office, it seems clear that Assignment of Error No. 4 was directed to the sufficiency of the evidence to sustain the burden of proof placed upon the Rate Office in such proceedings as this.

Assignment of Error (10) reads:

"(10) That the Commissioner erred in ordering * * * that private passenger automobile liability insurance rates be increased by 2.8% in that such order is based upon erroneous findings of fact and erroneous conclusions of law which resulted from incompetent testimony to which the Attorney General consistently made timely objections and motions to strike."

While these assignments of error are not stated with the utmost precision, they are, in my opinion, sufficient to present for the consideration of a reviewing court the sufficiency of the Commissioner's findings of fact and the sufficiency of the evidence to support them.

The learned judge who heard the matter in the Superior Court evidently regarded this question as having been raised for Conclusion No. 9 in his judgment reads: "There is substantial evidence in the record * * * to support the findings and con-

clusions of the Commissioner in finding present rates inadequate and ordering a 2.8% overall private passenger automobile liability insurance rate increase on and after January 28, 1970." The Attorney General assigned this conclusion as error in his appeal to this Court.

G.S. 58-9.3(b) provides that upon judicial review "the order or decision of the Commissioner if supported by substantial evidence shall be presumed to be correct and proper." This presumption relates to the correctness of the Commissioner's findings of fact. It does not bar reversal of the order for the failure of the Commissioner to make findings of fact adequate to support his order since, when this omission occurs, it is an error of law, apparent upon the face of the order.

Consequently, it is my view that the sufficiency of the evidence to support the Commissioner's findings of fact as to the adequacy or inadequacy of the former rates and the sufficiency of those findings of fact to support the order allowing the increase in the rates are questions properly before us on this appeal. For the reasons above mentioned, it is my view that the order of the Commissioner should be reversed and this matter remanded to him for the making of findings required by *In Re Filing by Fire Insurance Rating Bureau, supra.*

The statutes of this State impose upon the Commissioner the authority and the responsibility to make the determination of what is the profit actually made in North Carolina. He is not authorized by the statutes to accept determinations "elsewhere in the country" as to what is a reasonable "allocation" to profit, simply because such determinations have been made there. As the majority opinion states, there is nothing whatsoever in this record to show what profits were actually made by the insurance companies operating in North Carolina from their North Carolina business in the test years used in this proceeding. Without such evidence the finding of the Commissioner that a higher premium rate must be paid by the people of this State is unauthorized and should not be affirmed. It is, of course, entirely possible, so far as this record shows, that the Commissioner should have allowed an even larger increase. The difficulty is that the record does not show what, if any, increase is necessary to make the former rates "adequate."

The majority opinion notes the fact that North Carolina premium rates are lower than the average in the 25 Eastern

states, only two of these having rates lower than those paid in North Carolina. Elsewhere the majority opinion notes that "the Commissioner has held a tight rein with reference to any proposed increase of rates." It is not the function of the Commissioner to hold a tight rein or a loose one. He is charged with the duty of fixing rates which are adequate and reasonable.

The majority opinion says that the Legislature has not defined a "reasonable rate" or provided a formula to guide the Commissioner in determining the same. That being true, we must find the guidance in the terms "adequate" and "reasonable," which the Legislature has used, or conclude that the statute is designed to give the Commissioner arbitrary, dictatorial power to fix rates, in which event the statute itself would be unconstitutional. It is my view that the words "adequate" and "reasonable" are, themselves, sufficient as standards and, by analogy to the statutes providing for regulation of public utility rates, mean that the premium rates are to be fixed so as to provide sufficient funds to pay losses, all operating expenses, including taxes, and leave a margin of profit sufficient to attract investors to the insurance business in comparison with other businesses of like risk. See, *Bluefield Waterworks & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L. Ed. 1176. Without adequate findings of fact by the Commissioner no reviewing court can determine whether his order meets this requirement.

The majority opinion says, "It is noteworthy that a casualty insurance company, unlike a public utility, has no monopolistic or exclusive rights." In this State the companies are forbidden by law to vary from the premium rates fixed by the Commissioner. The Commissioner, in the present order, stated correctly that he fixes premium rates as if all the companies operating in this State were a single company, having the composite experience of all of them with reference to losses and operating expenses. Furthermore, the automobile owner and driver in North Carolina is required to purchase liability insurance, subject to an exception which for practical purposes may be disregarded. Technically, it may be correct to say that the automobile liability insurance business in North Carolina is not monopolistic but, so far as rate making is concerned, it is a complete monopoly whose services the public is not even at liberty to reject. The only thing that saves it from condemnation as a monopoly under the rule of *United States v. Southeastern Un-*

*derwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440, is that the State has provided a statutory procedure for regulating its rates in the public interest. Its rates should, therefore, be regulated at least as carefully as those of a public utility for whose services the public can often find an adequate substitute.

Of course, an insurance company has nothing comparable to the rate base of a public utility. The test of a fair return or profit to the insurance company is not to be measured by a percentage of the value of its properties in this State, but a fair return, measured by a percentage of gross sales in this State, can still be determined by the test of what is necessary to attract investors to this business. It is not sufficient for the Commissioner simply to take "allocations" made "elsewhere in the country."

The majority opinion holds that G.S. 143-317 and G.S. 143-318 are not applicable to a hearing before the Commissioner of Insurance for the purpose of a general revision of insurance rates. With this, and the implication inherent therein, that in such a proceeding the Commissioner of Insurance may act upon evidence not competent for admission in the Superior Court, I cannot agree. This decision, on this point, exposes the insurance companies, as well as the public, to the danger of arbitrary rate making, which danger is not insignificant merely because of justified confidence in the fairness and ability of the present Commissioner.

It is not necessary for this Court in this proceeding to hold G.S. 143-317 and G.S. 143-318 are not applicable to such hearings. The statistical data introduced in evidence over objection by the Attorney General was, in my opinion, clearly admissible in a proceeding in the Superior Court. This evidence falls within the limits of the well known exception to the Hearsay Rule for entries made in the regular course of business. *Sims v. Insurance Co.,* 257 N.C. 32, 125 S.E. 2d 326; *Insurance Co. v. Railroad,* 138 N.C. 42, 50 S.E. 452; Stansbury, North Carolina Evidence, 2d Ed, §§ 144, 155; Wigmore on Evidence, 3d Ed, § 1530. The admission of compilations and summaries of data, themselves prepared in the regular course of business, in lieu of a mass of original entries, is a proper extension of this exception to the Hearsay Rule. See: *Papadakis v. United States,* 208 F. 2d 945; *Massachusetts Bonding & Insurance Co. v. Norwich Pharmacal*

In re Filing by Automobile Rate Office

*Co.*, 18 F. 2d 934; *King v. State ex rel Murdock Acceptance Corp.*, 222 So. 2d 393 (Miss.) ; 1964 pocket supplements to Wigmore on Evidence, 3d Ed, § 1530.

G.S. 143-317 defines "Administrative Agency" to mean any State authority * * * or officer authorized by law to make administrative decisions, except agencies in the legislative and judicial departments of government * * *." It defines "Proceeding" to mean "any proceeding, by whatever name called, before an administrative agency of the State, wherein the legal rights, duties, or privileges of specific parties are required by law * * * to be determined after an opportunity for agency hearing." G.S. 143-318 provides, "In all proceedings * * * [t]he rules of evidence as applied in the superior and district court divisions of the General Court of Justice shall be followed."

The Commissioner of Insurance is a State officer authorized by law to make administrative decisions. He is a member of the executive, not of the legislative or judicial department of the State government. Constitution of North Carolina, Art. III, § 1. Consequently, he is an administrative agency within the meaning of these statutes. Although the fixing of rates by the Commissioner is an exercise of the State's legislative power, *In re Filing by Fire Insurance Rating Bureau, supra,* the Commissioner exercises this power as an administrative officer to whom it has been delegated by the Legislature. The hearing before him is not comparable to a hearing before a committee of the Legislature considering proposed legislative action. The purpose of the proceedings before him is to determine the right of the insurance companies operating in this State to charge the premiums which they propose to charge. That right is required by G.S. 58-248.1 to be determined after a hearing. G.S. 58-248.5 provides that a determination of such right is reviewable by appeal to the Superior Court of Wake County and thence to the Appellate Division, the judicial review being a "review of findings of fact and errors of law only." G.S. 58-9.3.

The plain language of the statutes seems clearly to encompass a hearing before the Commissioner for the fixing of insurance rates. The fact that the ratepayers are not designated by name and the fact that the petitioner in the proceeding represents 251 insurance companies, rather than one alone, are not material. If this were a proceeding by a single insurance company to determine its legal right to charge a higher premium

rate, it would seem quite clearly to fall squarely within the definitions of G.S. 143-317. The statute expressly excepts from its application proceedings before the North Carolina Utilities Commission. This strengthens my conclusion that it was intended to include proceedings before the Commissioner of Insurance to fix premium rates. The exclusion of the Utilities Commission clearly indicates that the Legislature understood a rate making proceeding before the North Carolina Utilities Commission would be within the statute without such exclusion. The obvious reason for the exclusion is that substantially the same provision is made applicable to the Utilities Commission by G.S. 62-65.

If the Commissioner can order a rate increase on the basis of evidence not admissible in the Superior Court, in a proceeding in which the judge sits without a jury, he can also order a decrease in the rates on the basis of such evidence. Thus, the insurance companies, as well as the public, are exposed by this decision to future findings made without support of evidence competent for consideration by the courts of this State. It is a high price to pay for a rate increase.